# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date:  _October 27, 2014_

**NO. 33,002**

**CATHY MOSES and PAUL F. WEINBAUM,**

Plaintiffs-Appellants,

v.

**HANNA SKANDERA,
ACTING SECRETARY OF EDUCATION and
NEW MEXICO PUBLIC EDUCATION DEPARTMENT,**

Defendants-Appellees,

and

**ALBUQUERQUE ACADEMY, et al.,**

Defendants-Intervenors-Appellees.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY
Sarah M. Singleton, District Judge**

Frank Susman
Santa Fe, NM

The Graeser Law Firm, LLC
Christopher L. Graeser
Santa Fe, NM

for Appellants

Albert V. Gonzales, Deputy General Counsel
Public Education Department
Santa Fe, NM

Sutin, Thayer & Browne, P.C.
Susan M. Hapka
Albuquerque, NM

for Appellees

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
R.E. Thompson
Emil J. Kiehne
Jennifer G. Anderson
Sarah M. Stevenson
Albuquerque, NM

for Intervenors-Appellees

**OPINION**

**WECHSLER, Judge.**

{1}     Under the Instructional Material Law, NMSA 1978, §§ 22-15-1 to -14 (1967, as amended through 2011) (IML), the State of New Mexico Public Education Department (the Department) purchases and distributes instructional material to school districts, state institutions, and private schools as agents for the benefit of eligible students.  Section 22-15-5, -7(B).  Plaintiffs, Cathy Moses and Paul F. Weinbaum, challenge the constitutionality of the IML with respect to the purchase and distribution of instructional material to private schools.  They rely upon the New Mexico Constitution Article IX, Section 14 (prohibiting the state from directly or indirectly lending or pledging "its credit or mak[ing] any donation to or in aid of any person, association or public or private corporation"); Article XII, Section 3 (prohibiting funds from use in support of sectarian, denominational, or private school); Article IV, Section 31 (prohibiting appropriation for educational purposes "to any person, corporation, association, institution or community, not under the absolute control of the state"); and Article II, Section 11 (granting the freedom to worship God according to one's own conscience and prohibiting the support of any religious sect or denomination).  Plaintiffs further contend that *Zellers v. Huff*, 1951-NMSC-072, 55 N.M. 501, 236 P.2d 949, is controlling precedent in this case.

{2}    The district court rejected Plaintiffs' arguments and granted summary judgment to Defendants Hanna Skandera, Acting Secretary of Education, and New Mexico Public Education Department. We hold that *Zellers* is not controlling and that the IML does not violate the New Mexico Constitution. We therefore affirm the district court's summary judgment.

**PROCEDURAL BACKGROUND**

{3}    Plaintiffs filed a verified complaint seeking a declaratory judgment as to the constitutionality of the IML. After Defendants answered, Plaintiffs filed a motion for summary judgment. At a hearing on the motion for summary judgment, the district court stated that it intended to grant the motion based on *Zellers*. Intervenors, the Albuquerque Academy, Anica and Maya Benia, the New Mexico Association of Nonpublic Schools, Rehoboth Christian School, St. Francis School, Sunset Mesa School, and Hope Christian School, then filed a motion to intervene. After Plaintiffs withdrew their initial opposition to intervention, the district court granted intervention and ordered additional briefing concerning the applicability of *Zellers*. The district court held a second hearing on the motion for summary judgment, reversed its prior ruling, and denied Plaintiffs' motion for summary judgment. It entered an order granting summary judgment to Defendants.

2

**THE IML**

{4}     The IML emanates from attempts by the New Mexico Legislature over time to provide textbooks and instructional material to New Mexico students.  In 1929, the Legislature enacted legislation entitled "Free Text Books" to provide free textbooks in the public schools and appropriated funds to cover purchases for first and second grade students.  NMSA 1929, §§ 120-1701, 1702 (1929).  In 1931, the Legislature created "a state school building, text book and rural aid fund" under the supervision of the State Board of Education and appropriated the annual balance of the fund under the Mineral Leasing Land Act (MLLA).  1931 N.M. Laws, ch. 138, §§ 1, 2.  In 1933, the Legislature expanded the Free Text Book Fund of the Free Text Books statute to include "free text books for all children in the schools in the State of New Mexico, from the first to eighth grades inclusive[.]"  1933 N.M. Laws, ch. 112, § 1. The statute was amended and recodified in 1941 and entitled "Text Books."  It provided appropriation from the fund under the MLLA.  NMSA 1941, §§ 55-1701 to -20 (1941 Comp.); § 55-1705.  This law was amended and recodified in 1967 and entitled "School Textbook Law." NMSA 1953, §§ 77-13-1 to -14 (Vol. 8, 1967 Repl. Pocket Supp.).  The School Textbook Law was amended in 1975 and labeled the "Instructional Material Law." NMSA 1953, §§ 77-13-1 to -14 (Interim Supp. 1975).

The IML was, in turn, amended and recompiled in 1978. NMSA 1978, §§ 22-15-1 to -14 (2005).

{5} The operation of the IML has historically been connected to the MLLA. Indeed, the principal, if not exclusive, funding source for the instructional material fund is the MLLA. Under the MLLA, one-half of the monies that the federal government receives from the rental of public lands is paid to the state within which the public land is located. 30 U.S.C. § 191 (2012). The New Mexico Legislature makes an annual appropriation from the MLLA to the instructional material fund. NMSA 1978, § 22-8-34(A) (2001).

{6} As currently enacted, the IML establishes the instructional material fund, a non-reverting fund administered by the Department, to be used to purchase "instructional material," defined under the IML as "school textbooks and other educational media that are used as the basis for instruction[.]" Section 22-15-2(C); -5. Free use of instructional material is provided to students attending early childhood programs and any grade through grade twelve in a public school, a state institution, or a private school approved by the Department. Section 22-15-7(A). Under the IML, schools obtain instructional material as agents for their students. Section 22-15-7(B). The process differs for private schools. While the Department distributes funds to public schools and state institutions to acquire instructional

material, it makes payment directly to an in-state depository for the instructional material for private schools. Section 22-15-9(D), (E). The school district or school is then responsible to distribute the instructional material for the students' use and to keep it safe. Section 22-15-7(B), (C).

{7} The school districts or schools, as agents for their students, select particular instructional material from a multiple list adopted by the Department. Section 22-15-8 (A), (B). Local school boards must solicit parental involvement in the process. Section 22-15-8(B). School districts may apply for a waiver to use a maximum of fifty percent of their annual allocations for instructional material not on the multiple list, and private schools may expend "up to fifty percent of their instructional material funds for items that are not on the multiple list; provided that no funds shall be expended for religious, sectarian or nonsecular materials[.]" Section 22-15-9(C).

**CONSTITUTIONAL ARGUMENTS**

**Standard of Review**

{8} Plaintiffs' constitutional arguments assert that the IML conflicts with four provisions of the New Mexico Constitution. In addressing these provisions, we review questions concerning constitutional interpretation as matters of law under de novo review. *Tri-State Generation & Transmission Ass'n, Inc. v. D'Antonio*, 2012-NMSC-039, ¶ 11, 289 P.3d 1232. We must presume that statutes are valid and

uphold them against constitutional challenge "unless we are satisfied beyond all reasonable doubt that the Legislature" exceeded its constitutional authority. *State ex rel. Udall v. Pub. Emps. Ret. Bd.*, 1995-NMSC-078, ¶ 7, 120 N.M. 786, 907 P.2d 190.

**Article XII, Section 3 of the New Mexico Constitution**

{9} As pertinent to this case, Article XII, Section 3 provides that no "funds appropriated, levied or collected for educational purposes, shall be used for the support of any sectarian, denominational or private school[.]" Our Supreme Court has stated that the purpose of this provision "is to insure exclusive control by the state over our public educational system, and to insure that none of the state's public schools ever become sectarian or denominational." *Prince v. Bd. of Educ. of Cent. Consol. Indep. Sch. Dist. No. 22*, 1975-NMSC-068, ¶ 20, 88 N.M. 548, 543 P.2d 1176. By "control," it meant "control over all of the affairs of the school[,]" including curriculum, discipline, finances, and administration. *Id.* ¶ 21.

{10} Plaintiffs do not assert that the distribution of instructional material to private schools as agents for their students interferes with the state's control over the public educational system. Indeed, under the IML, the Department controls the distribution and content of instructional material used by all students, including those in private schools. Sections 22-15-7(B), -8(A)-(C). Plaintiffs also do not assert that the

instructional material itself is sectarian or denominational because the IML specifically prohibits the use of funds for such material. Section 22-15-9(C).

{11} Plaintiffs do argue, more generally, that the furnishing of free instructional material to private schools conflicts with Article XII, Section 3. In addition to relying upon *Zellers*, Plaintiffs rely upon cases from other states in which courts have held unconstitutional provisions that Plaintiffs state are similar to Article XII, Section 3, preventing the state's distribution of free textbooks to students in private schools. Rather than accepting the rationale of these cases, the district court determined that cases from other states that upheld free textbook distribution were more persuasive because the constitutional provisions of those states more closely tracked Article XII, Section 12.

{12} In addressing Plaintiffs' position, we initially discuss *Zellers* because Plaintiffs argue that it controls this case and because, as we discuss, it is illustrative of the problems addressed by Article XII, Section 3. Concluding that *Zellers* is not controlling, we next discuss cases of the United States Supreme Court and the supreme courts of other states that consider the Establishment Clause of the First Amendment to the United States Constitution and state constitutions. We then analyze whether Article XII, Section 3 applies to this case.

***Zellers v. Huff***

{13}   The district court initially indicated its intent to hold that *Zellers* applies to the IML, but, after allowing intervention and additional briefing, and holding a second hearing, decided that *Zellers* did not control this case.  Plaintiffs urge this Court on appeal to hold that *Zellers* is binding precedent.

{14}   *Zellers* was a class action in which the plaintiffs requested the district court to declare illegal the teaching of sectarian religion in the public schools and the expenditure of public funds in aid of Roman Catholic parochial schools, to declare members of Roman Catholic religious orders ineligible to teach in public schools, to bar certain Roman Catholic sisters and brothers from teaching in the public schools, and to enjoin the activities embraced within the district court's rulings. 1951-NMSC-072, ¶¶ 1-2.  The complaint named as defendants the individual members of the State Board of Education, members of certain county, independent, and municipal boards of education, the State Educational Budget Auditor, and various members of Roman Catholic religious orders teaching in the schools included in the complaint. *Id.* ¶ 1.

{15}   The district court in *Zellers* addressed a number of issues arising from the multi-faceted interrelationship of the Roman Catholic Church, the State of New Mexico, and local schools in the operation of both public and parochial schools in various school districts in the state. *Id.* ¶¶ 1, 2, 4.  The district court summarized this

8

interrelationship by finding that "New Mexico had a Roman Catholic school system supported by public funds within its public school system." *Id.* ¶ 13.

{16}     The district court issued a broad-ranged declaratory judgment that included declaring that "the furnishing of free textbooks to schools other than tax supported schools" violates Article IX, Section 14 and Article XII, Section 3 of the New Mexico Constitution; that the furnishing of free textbooks for private, parochial, or sectarian schools was unlawful; and that public funds expended by the state in furnishing free textbooks were illegally used "in furtherance of the dissemination of Roman Catholic doctrines." *Zellers*, 1951-NMSC-072, ¶ 18.  Its relevant findings concerning textbooks were that, in some school districts within New Mexico, the state furnished textbooks without charge to parochial schools, *id.* ¶ 4; Roman Catholic sisters and brothers were paid by the state to teach in public schools, free textbooks were furnished, and religious doctrines were disseminated, *id.*; and the state had adopted a complete line of textbooks for use in Catholic schools that was furnished to the Catholic schools and some public schools without charge.  *Id.*  The district court enjoined the individual members of the State Board of Education from certain actions with respect to textbooks that included, "furnishing sectarian indoctrinated textbooks to tax supported schools," "[f]urnishing free textbooks to schools other than tax supported schools," and "[f]urnishing sectarian and indoctrinated textbooks or

9

textbooks for Catholic schools only to private or parochial schools at the expense of the state." *Id.* ¶ 19.

{17} The issue before our Supreme Court in *Zellers* that is relevant to this case concerns the injunction the district court issued barring the individual board members from taking action that the district court declared to be unconstitutional. Our Supreme Court vacated the injunction because the district court lacked subject matter jurisdiction. *Id.* ¶ 77. It otherwise affirmed the district court's judgment with exceptions not applicable to this case. *Id.* ¶ 83. Making an exception to its rule of refraining from addressing issues not before it for decision, because of the "grave importance of the matters involved," the Court stated that if the district court had properly had jurisdiction, its rulings underlying its injunction were correct. *Id.* ¶ 79.

{18} We do not believe that *Zellers* is precedent for this case for three reasons. First, both the district court and our Supreme Court lacked subject matter jurisdiction to address an injunction against the individual board members. When the lower court lacks jurisdiction to decide issues, the court on appeal also may not decide them. *State ex rel. Overton v. N.M. State Tax Comm'n*, 1969-NMSC-140, ¶ 20, 81 N.M. 28, 462 P.2d 613.

{19} Second, our Supreme Court's expression of its opinion concerning aspects of the district court's judgment over which it did not have jurisdiction is dictum. Dictum

10

is a statement "unnecessary to [a] decision of the issue before the Court . . . no matter how deliberately or emphatically phrased." *Ruggles v. Ruggles*, 1993-NMSC-043, ¶ 22 n.8, 116 N.M. 52, 860 P.2d 182. The Court's statement of the importance of the issue only emphasizes that it was expressing an opinion that was unnecessary to its decision. *Id.*; *see also Pincheira v. Allstate Ins. Co.*, 2007-NMCA-094, ¶ 51, 142 N.M. 283, 164 P.3d 982 ("When an appellate court makes statements that are not necessary to its decision, those statements are without the binding force of law.").

{20} Third, the issues of *Zellers*, as included in the district court's judgment in *Zellers*, are different from the issues in this case. Although the district court in *Zellers* enjoined the state from furnishing free textbooks to private schools, it did not rule upon the constitutionality of a predecessor statute to the IML, entitled "Text Books," NMSA 1941, Sections 55-1701 to -20, that was in effect at that time. That statute, like the IML, provided for the distribution of free textbooks to the students of the state regardless of the schools they attended. *Id.* In addition, the context in which the textbooks in *Zellers* were furnished is different from the manner in which instructional material is distributed under the IML. The furnishing of textbooks in *Zellers* was merely one aspect of the unconstitutional interrelationship that was the foundation for the education system. 1951-NMSC-072, ¶ 13. ("In short, New Mexico had a Roman Catholic school system supported by public funds within its

11

public school system."). The district court in *Zellers* found that public funds used for free textbooks "are used in furtherance of the dissemination of Roman Catholic religious doctrines to students attending" private schools and that the state had adopted a "complete line of text books . . . for use in Catholic schools" that it furnished to those schools as well as certain public schools without charge. *Id.* ¶ 4. There is no such record in this case. In contrast, the IML specifically provides that public funds cannot be used for sectarian materials. Section 22-15-9(C).

{21} Plaintiffs contend that this Court has the obligation to follow *Zellers* because of the principle of stare decisis. *See Trujillo v. City of Albuquerque*, 1998-NMSC-031, ¶ 33, 125 N.M. 721, 965 P.2d 305 ("Stare decisis is the judicial obligation to follow precedent[.]"). However, for the principle of stare decisis to apply, the prior case must be binding precedent. As we have discussed, *Zellers* is not binding precedent for this case.

**United States Supreme Court Establishment Clause Cases**

{22} The issue underlying Plaintiffs' argument is whether the furnishing of instructional material to students attending private schools provides unconstitutional support to private schools. Before discussing the cases involving constitutional provisions of other states cited by the parties, we note that the United States Supreme Court has determined issues involving the Establishment Clause of the First

12

Amendment to the United States Constitution that are relevant to our analysis. The Establishment Clause prevents Congress from making any law "respecting an establishment of religion[.]" U.S. Const. amend. I. Among its prohibitions is the levying of a tax "to support any religious activities or institutions[.]" *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 15-16 (1947). Most states have also adopted constitutional provisions with similar protections. *Id.* at 13-14. Article XII, Section 3 of the New Mexico Constitution adopts a similar protection.

{23} The United States Supreme Court has specifically addressed the question of whether a state statutory program providing textbooks to all students violates the Establishment Clause. In *Board of Education of Central School District No. 1 v. Allen (Allen II)*, 392 U.S. 236 (1968), the Court upheld a New York program in which local public school authorities loaned textbooks to all students in grades seven through twelve against an Establishment Clause challenge. *Id.* at 238. In its analysis, the Court looked to whether there was "a secular legislative purpose and a primary effect that neither advances nor inhibits religion." *Id.* at 243. It determined that the New York textbook law was intended to advance educational opportunities by extending the benefits of a general textbook lending program to all children and that the financial benefit was to the parents, not the schools the children attended. *Id.* at 243-44. The Court declined to hold, based on the record in the case, that the

textbooks, which required approval by public school authorities and included only secular textbooks, were "instrumental in the teaching of religion" at sectarian schools. *Id.* at 247-48. The Court recognized that the textbooks in part fulfilled the state's interest in providing a secular education. *Id.* The Court noted that the problem presented to it of drawing a "line between state neutrality to religion and state support of religion" was not an easy one and was "one of degree." *Id.* at 242 (internal quotation marks and citation omitted).

{24}    The United States Supreme Court subsequently ruled upon textbook lending programs on two other occasions. In *Meek v. Pittenger*, 421 U.S. 349 (1975), *overruled by Mitchell v. Helms*, 530 U.S. 793 (2000), following *Allen II*, the Court upheld a Pennsylvania program that authorized the loan of textbooks that would be acceptable in the public schools to children attending nonpublic schools. *Meek*, 421 U.S. at 353-54, 362. As a guideline, it applied the three-part test it had developed in its recent Establishment Clause cases: (1) whether the statute has a secular purpose, (2) whether the statute has a primary effect that neither advances religion nor inhibits it, and (3) whether the statute and its administration avoids excessive government entanglement with religion. *Id.* at 358-59. The Court noted, as in *Allen II*, that the Pennsylvania program was part of a policy to lend textbooks to all schoolchildren, the financial benefit inured to the parents and children rather than the nonpublic schools,

and the textbooks to be loaned were acceptable for the public schools and used only for secular purposes. *Meek*, 421 U.S. at 360-62. It reiterated that the constitutional problem "is one of degree[,]" stating that "not all legislative programs that provide indirect or incidental benefit to a religious institution are prohibited by the Constitution." *Id.* at 359 (internal quotation marks and citation omitted). The Court thought otherwise, however, about the lending of instructional material and equipment such as maps, charts, and laboratory equipment directly to nonpublic schools rather than to the students. *Id.* at 362-63, 365. The Court found constitutional fault with the legislation because it did not take into account that the "substantial amounts of direct support authorized" would make it impossible "to separate secular educational functions from the predominantly religious role" of the schools. *Id.* at 365.

{25} The United States Supreme Court again considered a statutory textbook program in *Wolman v. Walter*, 433 U.S. 229 (1977), *overruled by Mitchell*, 530 U.S. 793. The Court followed *Allen II* and *Meek*. *Wolman*, 433 U.S. at 238. It also determined that provisions of the Ohio statute that provided public funds for standardized tests and scoring services; speech and hearing diagnostic services; and therapeutic, guidance, and remedial services were not constitutionally inappropriate

15

but that the lending of instructional materials and equipment to students and the funding of field trip transportation and services was. *Id.* at 239-54.

{26} In *Wolman*, the Supreme Court specifically declined to overrule the textbook rulings of *Allen II* and *Meek*. *Wolman*, 433 U.S. at 238. In *Mitchell*, however, it did overrule *Meek* and *Wolman* with respect to its previous instructional material and equipment rulings. *Mitchell*, 530 U.S. at 808. In *Mitchell*, the Court held that a federal program under which state and local governmental agencies received funds to loan educational materials and equipment to public and private schools based on enrollment did not offend the Establishment Clause. *Id.* at 801. According to the Court, the program was neutral with respect to religion because it "makes a broad array of schools eligible for aid without regard to their religious affiliations or lack thereof" and because "[t]he aid follows the child." *Id.* at 830.

{27} As demonstrated by *Allen II*, *Meek*, and *Wolman*, the United States Supreme Court's analysis under the Establishment Clause does not support Plaintiffs' position in this case. The Court's analysis focuses upon the neutrality of a challenged law and does not invalidate a law that applies neutrally to students of public and private schools, even if there may be a degree of benefit that inures to the private school. But this case is based on state constitutional provisions, not on the Establishment Clause.

16

We thus turn to the cases cited by the parties and the state constitutional provisions at issue in those cases.

**Cases Addressing Other State Constitutional Provisions**

{28}     Plaintiffs rely on five cases that they contend involve similar issues to Article XII, Section 3 of the New Mexico Constitution.  They first refer to *California Teachers Association v. Riles*, 632 P.2d 953 (Cal. 1981).  That case involved a challenge to a California law authorizing the Superintendent of Public Instruction to lend to students attending nonprofit, nonpublic schools textbooks used in the public schools without charge.  *Id.* at 953.  Article IX, Section 8 of the California Constitution provided:  "No public money shall ever be appropriated for the support of any sectarian or denominational school, or any school not under the exclusive control of the officers of the public schools[.]"  *Riles*, 632 P.2d at 954 n.3 (internal quotation marks and citation omitted).  Under Article XVI, Section 5 of the California Constitution:

> Neither the Legislature, nor any county, city and county, township, school district, or other municipal corporation, shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose, or help to support or sustain any school, college, university, hospital, or other institution controlled by any religious creed, church, or sectarian denomination whatever; nor shall any grant or donation of personal property or real estate ever be made by the state, or any city, city and county, town, or other municipal corporation for any religious creed, church, or sectarian purpose whatever[.]

17

*Riles*, 632 P.2d at 954 n.4.

{29} The California court discussed at some length United States Supreme Court cases concerning the Establishment Clause. It independently decided that the textbook program could not survive state constitutional scrutiny. *Id.* at 964. Persuaded by Justice Brennan's dissent in *Meek*, which was critical of the characterization of the textbook program as a loan to students, it did not accept the "child benefit" theory that the program benefitted the students and not the schools or that the benefit to the schools was only incidental. *Riles*, 632 P.2d at 960-64.

{30} *Gaffney v. State Department of Education*, 220 N.W.2d 550 (Neb. 1974) addressed a broad constitutional provision with similar language to Article XVI, Section 5 of the California Constitution. *Gaffney*, 220 N.W.2d at 552; *Riles*, 632 P.2d at 964. The Nebraska Supreme Court relied on the broad language of its constitutional provision to hold that the textbook loan program furnished "aid" to private sectarian schools. *Gaffney*, 220 N.W.2d at 552-54. It stated that, even assuming neutrality, the loan program "is for the purpose of augmenting the public school secular education with religious training" and was "aiding the church" in advancing religious education. *Id.* at 557. It further stated that the fact that the loan of the textbooks was to the parents and students was not determinative because the

program "lends strength and support to the school and, although indirectly, lends strength and support to the sponsoring sectarian institution." *Id.*

{31}    In *Dickman v. School District No. 62C*, 366 P.2d 533 (Or. 1961) (en banc), the Supreme Court of Oregon considered a textbook loan program in the context of two constitutional provisions:  one prohibited in part money to be drawn from the state treasury "for the benefit" of any religious or theological institution; and the other provided that various revenue sources "shall be exclusively applied to the support, and maintenance of common schools in each School district, and the purchase of suitable libraries, and apparatus therefor." *Id.* at 535 nn.2-3, 537.  It noted that the first provision expressed "in more specific terms" the policy of the First Amendment. *Id.* at 537.  Like the California Supreme Court, the Oregon court rejected the child benefit principle. *Id.* at 539, 543-44.  It stated that "the aid is extended to the pupil only as a member of the school" the pupil attends and, thereby, although the pupil may share in the benefit, "such aid is an asset to" the school. *Id.* at 543.

{32}    *Bloom v. School Committee of Springfield*, 379 N.E.2d 578 (Mass. 1978), and *Paster v. Tussey*, 512 S.W.2d 97 (Mo. 1974), also involve particular constitutional provisions. The Massachusetts provision at issue in *Bloom* prohibited in relevant part the "grant, appropriation or use of public money . . . for the purpose of . . . maintaining or aiding any . . . school, or charitable or religious undertaking

which is not publicly owned and under the exclusive control, order and supervision of public officers . . . ." 379 N.E.2d at 581, 585 (internal quotation marks and citation omitted). As stated by the *Paster* court, the Missouri Constitution "goes even farther than those of some other states" and is more restrictive than the Establishment Clause. 512 S.W.2d at 101-02 (internal quotation marks and citation omitted).

{33} The district court determined that the out-of-state cases cited by Defendants provided more persuasive authority than those cited by Plaintiffs. Defendants cited *Board of Education of Central School District No. 1 v. Allen* (*Allen I*), 228 N.E.2d 791 (N.Y. 1967); *Chance v. Mississippi State Textbook Rating & Purchasing Board*, 200 So. 706 (Miss. 1941) (in banc); and *Borden v. Louisiana State Board of Education*, 123 So. 655 (La. 1929). The New York Court of Appeals in *Allen I*, in rejecting the state constitutional challenge, recognized the legislative intent "to bestow a public benefit upon all school children, regardless of their school affiliations." 228 N.E.2d at 794. It considered any benefit to parochial schools to be "collateral." *Id.* In *Chance*, the Mississippi Supreme Court analyzed a constitutional provision that barred, similarly to Article XII, Section 3 of the New Mexico Constitution, the appropriation of funds "toward the support of any sectarian school[.]" *Chance*, 200 So. at 707. It too noted the duty of the state to educate the children of the state and considered the aid to the parochial schools to be only

20

incidental. *Id.* at 712-13. It further noted the non-sectarian content of the textbooks and the continued control over them by the state. *Id.* at 713. *Borden* involved a constitutional provision like the restrictive Missouri one addressed in *Paster*. *Borden*, 123 So. at 660. Nevertheless, the Louisiana Supreme Court reached a contrary result, stating in part that the state and the children were the beneficiaries of the appropriations, not the schools, which were not "relieved of a single obligation" by the appropriations. *Id.* at 660-61. The cases cited by Defendants were decided before the United States Supreme Court addressed textbook programs in connection with the Establishment Clause.

**Interpretation of Article XII, Section 3 of the New Mexico Constitution**

{34} Article XII, Section 3 prohibits the use of state funds for the support of sectarian, denominational, and private schools. It was adopted, like similar provisions of many states, in the wake of the Establishment Clause of the First Amendment. *Everson*, 330 U.S. at 13-14. In the United States Supreme Court's interpretation of the Establishment Clause, programs such as the IML are not prohibited. The states that have interpreted their constitutional provisions have reached conflicting results. In interpreting Article XII, Section 3, we are not bound by any of these strains of cases and, even though New Mexico, and the other states, have followed the concepts of the United States Constitution, we may interpret

21

Article XII, Section 3 differently. *See N.M. Right to Choose/NARAL v. Johnson*, 1999-NMSC-005, ¶ 28, 126 N.M. 788, 975 P.2d 841 (NARAL) (stating that our Supreme Court may "undertake independent analysis of our state constitutional guarantees" (internal quotation marks and citation omitted)). We may, nevertheless, look to cases of either the United States Supreme Court or the courts of other states for guidance. Moreover, this Court has observed that because the goals of Article II, Section 11 of the New Mexico Constitution serve the same goals as the Free Exercise and Establishment Clauses of the First Amendment, New Mexico courts have cited First Amendment cases to address both the United States and state constitutions. *Elane Photography, LLC v. Willock*, 2012-NMCA-086, ¶ 33, 284 P.3d 428, *aff'd*, 2013-NMSC-040, 309 P.3d 53, *cert. denied*, 134 S.Ct. 1787 (2014). We see no reason to treat Article XII, Section 3 differently.

{35} An essential difference between the United States Supreme Court cases and the cases cited by Plaintiffs is the approach to the public benefit of textbook programs. The principle underlying such programs is the public obligation to educate all children regardless of where they attend school. *See, e.g.*, *Allen II*, 392 U.S. at 243 (stating that the purpose of the New York textbook law was to further "the educational opportunities available to the young. . . . The law merely makes available to all children the benefits of a general program to lend school books free of

charge."). In Plaintiffs' cases, the courts have held that the programs do not only benefit the children and their parents, but also the private, parochial schools. As stated in *Riles*, textbooks are "a basic educational tool." 632 P.2d at 963 (internal quotation marks and citation omitted). As discussed in *Gaffney*, and quoted in *Riles*, because "one of the main purposes of the parent sending his child to a parochial school is to insure the early inculcation of religion[,]" even if textbooks are secular, the loan of textbooks to students "is for the purpose of augmenting the public school secular training with religious training." *Gaffney*, 220 N.W.2d at 557; *Riles*, 632 P.2d at 964, n 15 (internal quotation marks and citation omitted); *see also Dickman*, 366 P.2d at 544 (noting that textbooks are an "integral part of the educational process" and that the teaching of religious precepts is an inseparable part of the educational process in the school at issue).

{36} We are not persuaded that the cases cited by Plaintiffs should be followed in this case. We believe that the legislative intent in promoting the education of all schoolchildren in New Mexico deserves greater weight than the cases cited by Plaintiffs afford. Despite Justice Brennan's dissent in *Meek*, relied upon in *Riles*, the United States Supreme Court has repeatedly recognized the general, public nature of such programs and has declined to hold that "the processes of secular and religious training are so intertwined that secular textbooks furnished to students by the public

23

are in fact instrumental in the teaching of religion." *Allen II*, 392 U.S. at 248; *Meek*, 421 U.S. at 360-62; *Wolman*, 433 U.S. at 257. Under the IML, the instructional material is strictly secular. Section 22-15-9(C). Plaintiffs did not present any evidence to demonstrate that the secular materials are used in a non-secular manner. *See Allen II*, 392 U.S. at 248 (noting that the record on summary judgment did not support that the textbooks were used to support religion).

{37} As part of its analysis rejecting the "child benefit" principle, the California court in *Riles* stated that it could not harmonize the reasoning of *Allen II*, *Meek*, and *Wolman* with regard to the loan of other instructional material such as maps, globes, and charts. *Riles*, 632 P.2d at 960-61. Indeed, the United States Supreme Court has had difficulty reaching harmony in this regard. However, such a disharmony no longer exists in the United States Supreme Court jurisprudence since the Court stated in *Mitchell* that *Meek* and *Wolman* were "no longer good law" in this regard. *Mitchell*, 530 U.S. at 808.

{38} Moreover, not only is the United States Supreme Court now clear in its analysis that textbook and instructional material programs that benefit all children regardless of the school of their attendance do not conflict with the Establishment Clause, since *Riles*, it has also upheld the constitutionality of other governmental programs that benefit all students, including those who attend private and parochial schools. *See*

24

*Zelman v. Simmons-Harris*, 536 U.S. 639, 645, 662 (2002) (concluding that a law in which the state of Ohio created a program that provided tuition assistance to parents of eligible children to attend a participating public or private school of the parent's choosing was "entirely neutral with respect to religion" and did not violate the Establishment Clause); *Mitchell*, 530 U.S. at 793 (upholding program lending educational materials and equipment to public and private schools based on enrollment); *Agostini v. Felton*, 521 U.S. 203, 209-10, 240 (1997) (holding that a federally-funded program in which public school teachers provided remedial education to disadvantaged children in parochial schools as well as public schools did not violate the Establishment Clause); *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1 (1993) (holding that the Establishment Clause does not bar local school district from providing a publicly-employed interpreter for a deaf student in a parochial school).

{39} The United States Supreme Court has in addition repeatedly stated that the constitutional issue involved in these types of programs is one of degree. *Allen II*, 392 U.S. at 242; *Meek*, 421 U.S. at 359. We agree. In this regard, we do not interpret Article XII, Section 3 to prohibit indirect and incidental benefit when the legislative purpose does not focus on support of parochial or private schools. We would read too much into the record of this case to conclude that the loan of instructional

25

material to students under the IML is so inextricably intertwined that the IML instructional material is instrumental in the religious education. Our focus is therefore whether the IML provides impermissible other support of a financial nature. In contrast, the evidence in *Riles* indicated that without the loan program parochial schools purchased their own textbooks and charged the parents a rental fee. 632 P.2d at 956. There is no similar evidence in this case.

{40} Nevertheless, even if we were to assume a similar arrangement, the focus of the IML is to provide instructional material for the benefit of students. Section 22-15-7(A). It is secular in nature. Section 22-15-9(C). Private schools do not own the instructional material, and the state controls its use and disposition. *See* Section 22-15-10(D), (E) (requiring private schools to return to the Department money collected for sale, loss, damage, or destruction of instructional material as well as any instructional material in usable condition for which there is no expected use). Although private schools maintain a possessory control, they do so as agents for their students. Section 22-15-7(B). The instructional material is, of course, used in the schools for the benefit of the students, and the schools thereby receive some benefit. But the parents of the students bear the financial burden of providing the instructional material and are the direct recipients of the program's financial support. This case is not like *Zellers* in which there was an apparent infringement of the purpose of Article

26

XII, Section 3 "to insure exclusive control by the state over our public educational system[.]" *Prince*, 1975-NMSC-068, ¶ 20. The benefit to the schools is not of the degree that falls within Article XII, Section 3.

**Article IX, Section 14 of the New Mexico Constitution**

{41}     Article IX, Section 14, the Anti-Donation Clause, provides in relevant part:

> Neither the state nor any county, school district or municipality, except as otherwise provided in this constitution, shall directly or indirectly lend or pledge its credit or make any donation to or in aid of any person, association or public or private corporation . . . .

Appellants, quoting from *Village of Deming v. Hosdreg Co.*, contend that the IML violates this provision because "the lending of free textbooks and other instructional materials at public expense to private schools constitutes a 'donation to or in aid of [a] person, association or public or private corporation.'" 1956-NMSC-111, ¶ 36, 62 N.M. 18, 303 P.2d 920.

{42}     In *Village of Deming*, our Supreme Court addressed Article IX, Section 14. In that case, the Village of Deming, following a recently-enacted statute, had passed an ordinance to issue revenue bonds to finance a manufacturing project that the Village would in turn lease to a private company. *Id.* ¶¶ 4, 5, 21. The complaint alleged a violation of Article IX, Section 14 because the revenue bonds issued under the statute and the ordinance "would constitute the giving of aid to private enterprise." *Id.* ¶ 30 (internal quotation marks and citation omitted). The Court noted that the language

of the complaint differed from the constitutional prohibition that, as also relevant to the case before us, forbids a "donation to or in aid of" a private corporation. *Id.* ¶ 31 (internal quotation marks and citation omitted). The Court construed a donation under Article IX, Section 14 to be "a gift, an allocation or appropriation of something of value, without consideration to a person, association or public or private corporation." *Id.* ¶ 36 (internal quotation marks omitted); *see also State ex rel. Office of State Eng'r v. Lewis*, 2007-NMCA-008, ¶ 49, 141 N.M. 1, 150 P.3d 375 (citing *Village of Deming* for the definition of a donation under Article IX, Section 14). It held that the statute authorizing the revenue bonds did not entail such a "donation." With respect to the language of the complaint, it declined to conclude that the statute provided for an unconstitutional violation even if there was "incidental aid or resultant benefit to a private corporation" that did not "take on character as a donation in substance or effect." *Vill. of Deming*, 1956-NMSC-111, ¶¶ 34, 37.

{43} Applying *Village of Deming* to this case, we see no constitutional infirmity in the IML. There is no "donation" to a private school because there is neither a "gift" nor an "allocation or appropriation of something of value, without consideration." *Id.* ¶ 36.

{44} As to a gift, although private schools receive possession of the instructional material, they never have an ownership interest in it. They receive possession only

28

as agents for their students. Section 22-15-7(B). They may sell instructional material only with approval of the director of the Department's instructional material bureau and must return all proceeds from sales and monies collected for lost, damaged, and destroyed items to the Department. Section 22-15-2(B), -10(A), (D). The Department may require them to return to the Department any usable instructional material that they no longer intend to use. Section 22-15-10(E). There is thus no gift of the instructional material as contemplated by *Village of Deming*.

{45} Nor is there an allocation or appropriation of something of value, without consideration. As we have discussed, the IML authorizes the distribution of instructional material to private schools only as agents for their students. Section 22-15-7(B). With this distribution, although the private schools may receive an "allocation," it is only as a conduit for their students, who, presumably, would otherwise need to pay for instructional material. Section 22-15-9(A).

{46} Our Supreme Court has also stated that Article IX, Section 14 "should be construed with reference to the evils it was intended to correct." *City of Clovis v. Sw. Pub. Serv. Co.*, 1945-NMSC-030, ¶ 23, 49 N.M. 270, 161 P.2d 878. Such evils occurred when public bodies loaned their credit to, or obtained an interest in, commercial entities that ultimately required the public to assume responsibilities for their obligations to the detriment of the public fisc. *Id.* ¶¶ 23-24. No such danger

exists due to the IML. The State has not loaned its credit or obtained any financial interest in any private school.

{47} The absence of any lending of credit also distinguishes *Hutcheson v. Atherton*, 1940-NMSC-001, 44 N.M. 144, 99 P.2d 462, relied upon by Plaintiffs. Indeed, as stated by Plaintiffs, our Supreme Court in *Hutcheson* affirmed the district court's finding that a county's issuing bonds to finance an auditorium for the purposes of a private corporation violated Article IX, Section 14. *Hutcheson*, 1940-NMSC-001, ¶¶ 34-35, 37. But the county's inappropriate action in *Hutcheson* was its proposed lending of its credit through the issuance of bonds. *Id.* ¶ 1. The provision of Article IX, Section 14 at issue in this case pertains to a prohibited donation, not the lending or pledging of credit. It does not involve a prohibited donation under Article IX, Section 14.

{48} We note that Intervenors argue that Article IX, Section 14, as well as Article XII, Section 3 and Article IV, Section 31, do not apply to the IML because the IML is funded by the New Mexico Legislature with federal MLLA funds. Because we hold that the IML does not violate these constitutional provisions, we do not address this argument.

**Article IV, Section 31 of the New Mexico Constitution**

{49}    Article IV, Section 31 prohibits appropriations "for charitable, educational or other benevolent purposes to any person, corporation, association, institution or community, not under the absolute control of the state[.]" Plaintiffs assert that the use of public, state funds to finance the IML is unconstitutional to the extent such funds support sectarian or denominational private schools.

{50}    Plaintiffs, however, have not demonstrated that funds used to support the IML are not within the control of the state. Under the IML, appropriations are made to the Department's instructional material fund, created by the state treasurer. Section 22-15-5(A). Disbursements from the instructional material fund are made "by warrant of the department of finance and administration upon vouchers issued by" the Department. Section 22-15-6. The Department makes payment to an in-state depository for instructional material distributed to private schools as agents for their students. Sections 22-15-7(B), -9(E). No funds are appropriated to any private school. The mere indirect or incidental benefit to the private schools does not violate Article IV, Section 31. *Cf. State ex rel. Interstate Stream Comm'n v. Reynolds*, 1963-NMSC-023, ¶ 17, 71 N.M. 389, 378 P.2d 622 (holding that incidental benefits to a non-profit organization from appropriations made to the state engineer with absolute control of the expenditure does not violate Article IV, Section 31).

31

{51} Plaintiffs rely on *Harrington v. Atteberry*, 1915-NMSC-058, 21 N.M. 50, 153 P. 1041, to contend that the IML is in "direct conflict" with Article IV, Section 31. *Harrington*, however, is not on point. In that case, our Supreme Court held that an appropriation to a private corporation for the purpose of conducting a county fair violated the New Mexico Constitution. *Id.* ¶¶ 1, 63. Although the concurring opinion would have relied on Article IV, Section 31, the opinion of the Court addressed only Article IX, Section 14. *Id.* ¶¶ 6, 66-67 (Hanna, J., concurring in result).

**Article II, Section 11 of the New Mexico Constitution**

{52} Article II, Section 11 states:

> No person shall be required to attend any place of worship or support any religious sect or denomination; nor shall any preference be given by law to any religious denomination or mode of worship.

Plaintiffs argue that the IML violates Article II, Section 11.

{53} This Court has stated that Article II, Section 11 serves the same goals as the Establishment Clause and the Free Exercise Clause of the First Amendment. *Elane Photography*, 2012-NMCA-086, ¶ 33. As a result, New Mexico courts have discussed Article II, Section 11 and the First Amendment together, citing federal case law in connection with Article II, Section 11. *Elane Photography*, 2012-NMCA-086, ¶ 33. Indeed, New Mexico courts may "diverge from federal precedent" and afford greater protections under provisions of the New Mexico Constitution. *NARAL*, 1999-

32

NMSC-005, ¶ 28 (internal quotation marks and citation omitted). However, Plaintiffs have not argued a basis to do so. As we have discussed in connection with Article XII, Section 3 and the Establishment Clause, the United States Supreme Court does not interpret the First Amendment to prohibit programs such as those contained within the IML.

**CONCLUSION**

{54} We affirm the district court's grant of summary judgment to Defendants.

{55} **IT IS SO ORDERED.**

_____

**JAMES J. WECHSLER, Judge**

**WE CONCUR:**

_____

**MICHAEL D. BUSTAMANTE, Judge**

_____

**M. MONICA ZAMORA, Judge**